UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHARLES E. BROWN, on behalf of
himself, and all others similarly situated,

        Plaintiff,

      v.

SBC COMMUNICATIONS, INC.,
ENHANCED SERVICES BILLING, INC.,
BILLING SERVICES GROUP, LLC, ABRY
PARTNERS, LLC, ILD
TELECOMMUNICATIONS, INC., and ILD
TELESERVICES, INC.,

        Defendants.

Case No. 05-cv-777-JPG

## **MEMORANDUM AND ORDER**

### A.    Introduction

Plaintiff Charles Brown, a local telephone subscriber of defendant SBC Communications, Inc., ("SBC") alleges that on at least eleven occasions in 2004 and 2005, he was billed for telecommunications services he did not request, a practice Brown calls "cramming." Brown originally filed this action in the Circuit Court of the Twentieth Judicial Circuit, St. Clair County, Illinois, on behalf of himself and a proposed class of SBC subscribers who allegedly were subjected to the "cramming" of unauthorized charges onto their monthly billing statements from SBC, asserting claims for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 – 505/12, ("ICFA") and unjust enrichment. Thereafter, the action was removed to this Court pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.) ("CAFA"). By order entered September 29, 2006, the Court held that removal of this case was proper pursuant to CAFA and denied remand of the case to state court.

According to the allegations of Brown's complaint, on at least five occasions (February 2004, March 2004, May 2004, June 2004, and July 2004) Brown's monthly billing statement from SBC contained a $14.95 charge for "Traveller Info Svcs #," which Brown alleges is a monthly fee for "technical support services" that he never authorized.  Complaint ("Compl.") ¶ 19(a).  Likewise, Brown alleges that on at least six occasions (August 2004, September 2004, October 2004, November 2004, December 2004, and January 2005) he was billed a monthly fee of $14.95, together with taxes and local, state, and federal charges of $1.36, for "Nationwide Voice Msg," a "nationwide voice messaging" service Brown never requested. *Id*. ¶ 19(b).  It appears from the complaint that there is some dispute as to whether Brown in fact ordered the services at issue.  *See id*. ¶ 21.  SBC is, as discussed, Brown's local telephone service or "local exchange carrier" ("LEC").  *Id*. ¶ 19.  Defendant Enhanced Services Billing, Inc., ("ESBI") is, according to Brown's complaint, a company that bills consumers directly or through LECs for services provided by third-party companies in the telecommunications industry, as is defendant ILD Telecommunications, Inc. ("ILD").  *See id*. ¶ 5, ¶ 8.[1]  ILD is alleged to be responsible for placing the unauthorized charges for "Nationwide Voice Msg" on Brown's SBC billing statement.  *Id*. ¶ 8, ¶ 19(b).  Although it is not entirely clear from the allegations of Brown's complaint, presumably Brown believes that ESBI is responsible for placing the unauthorized charges for "Traveller Info Svcs #" on Brown's SBC billing statement.  Defendant Billing Services Group, LLC, ("BSG") which is also a billing company, is alleged to own ESBI; defendant Abry Partners, LLC, ("Abry") is alleged to own BSG.  *See id*. ¶ 6, ¶ 7.

---

1.    Although the caption of Brown's complaint lists as separate defendants ILD and ILD Teleservices, Inc., it appears from the allegations of the complaint and from ILD's submissions to the Court that they are in fact the same entity.  *See, e.g.,* Compl. ¶ 8.  Therefore, throughout this order the Court will refer to both defendants simply as ILD.

Brown alleges that all of the defendants acted jointly to "cram" unauthorized charges onto the SBC billing statements of Brown and the members of the proposed class.  Brown seeks to represent a class of Illinois residents who were billed for unauthorized charges through their billing statements from SBC from June 16, 2002, to the present.  *See* Compl. ¶ 9.  This matter currently is before the Court on motions to dismiss for failure to state a claim upon which relief can be granted brought by SBC (Doc. 17), ESBI and BSG (Doc. 12), and Abry (Doc. 15), and on a motion to dismiss for lack of personal jurisdiction brought by ILD (Doc. 13).  Having reviewed carefully the submissions of the parties, the Court now is prepared to rule.

### B.     Failure to State a Claim Upon Which Relief Can Be Granted

### 1      Legal Standard

The purpose of a motion to dismiss for failure to state a claim upon which relief can be granted brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is to test the sufficiency of a complaint, not to resolve a case on its merits.  *See Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326-27 (7th Cir. 2000).  When evaluating a Rule 12(b)(6) motion, a court must accept as true all factual allegations in a complaint and draw all reasonable inferences in a plaintiff's favor.  *See Hentosh v. Herman M. Finch Univ. of Health Scis./The Chicago Med. Sch.*, 167 F.3d 1170, 1173 (7th Cir. 1999).  Because the Federal Rules of Civil Procedure establish a liberal pleading system that requires only notice pleading, a "complaint's mere vagueness or lack of detail is not sufficient to justify a dismissal."  *National Serv. Ass'n, Inc. v. Capitol Bankers Life Ins. Co.*, 832 F. Supp. 227, 230 (N.D. Ill. 1993).  A motion to dismiss should not be granted unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  *See also Johnson v. Martin*, 943 F.2d 15, 16 (7th Cir. 1991).

3

2.    **ICFA**

ESBI, which, as discussed, is a billing clearinghouse, argues that the misconduct alleged against it in Brown's complaint amounts at most to aiding and abetting a violation of the ICFA. Section 2 of the ICFA provides,

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.  In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2 (footnote omitted).  The Supreme Court of Illinois has held that merely aiding and abetting an ICFA violation, that is, "knowingly receiv[ing] the benefits of another's fraud," is not actionable as a violation of section 2 of the statute.  *Zekman v. Direct Am. Marketers, Inc.*, 695 N.E.2d 853, 859 (Ill. 1998).  In *Zekman* a consumer who allegedly had been induced by fraudulent mailings from a direct mail marketer, Direct American Marketers, Inc., ("Direct American") to make telephone calls to a 900 number, thus incurring toll charges, brought suit under the ICFA against both Direct American and AT & T, which had billed the consumer for the toll charges, retaining a percentage of the charges and remitting the rest to Direct American.  *See id.* at 856.  The court concluded that the conduct alleged against the telephone company was not actionable under the ICFA:

> We agree with AT & T that the plain language of section 2 of the Act does not include anything that makes it unlawful to knowingly receive the benefits of another's fraud.  As this court stated in *Laughlin v. Evanston Hospital*, 133 Ill.2d 374, 390, 140 Ill. Dec. 861, 550 N.E.2d 986 (1990), "[t]he language of the Act shows that its reach was to be limited to conduct that defrauds or deceives

4

consumers or others."  To allow plaintiff to recover for AT & T's knowingly receiving the benefits of Direct American's fraud would require us to read into the statute violations that are not a part of the statutory text.

* * * *

Canons of statutory interpretation additionally guide our decision that knowingly receiving the benefits of another's fraud is not actionable under section 2 of the Act.  When a statute provides a list that is not exhaustive, as section 2 does ("including but not limited to . . ."), the class of unarticulated things will be interpreted as those that are similar to the named things . . . . The common feature of the forms of conduct listed in section 2 of the Act is that they involve actions directly done by the perpetrator of the fraud.  Knowingly receiving the benefits of another's fraud, however, more closely resembles a form of secondary liability.  We believe that a claim for knowingly receiving the benefits of another's fraud is not so similar to the enumerated violations of section 2 of the Act that the legislature intended for it to be a cause of action under that statute.  With no clear indication from the legislature that such conduct violates section 2 of the Act, we cannot extend liability to those who knowingly receive the benefits of another's fraud.

*Id*. at 859.

In the case at bar the Court agrees with Brown that the allegations of his complaint establish more than ESBI's passive involvement in the alleged fraud.  Brown's complaint alleges,

Service providers or LECs sometimes use several billing clearinghouses to obtain the different services needed to get the billing information ready for the LECs.  For example, one billing clearinghouse might provide a "rating" service, i.e., applying the proper charges for each call made.  A second billing clearinghouse may then actually prepare and submit the resulting data to the LEC.  In this instance, the actual carrier or service provider is three steps removed from the customer.  The chain is:  carrier or service provider, first billing agent, second billing agent, LEC, and end-use customer.  When the customer pays the bill, the money flows in reverse sequence from the LEC to the carrier or service provider.  Because customers may subsequently seek refunds, LECs and billing agents typically hold a percentage of the payments as reserves.

* * * *

The use of billing agents creates a situation that facilitates cramming by carriers and service providers.  On the basis of invalid authorizations, such carriers and

5

service providers are able to generate accounts receivable before the end-use customers are even billed.  Once these customers are billed, many of them unwittingly pay the unauthorized charges, each of which is in a small enough amount to "fly under the radar" of many subscriber's suspicions.

Compl. ¶¶ 17-18.  Concerning ESBI, Brown's complaint alleges that "ESBI is no stranger to cramming . . . . [O]n August 6, 2001, the Federal Trade Commission announced that ESBI, among others, had agreed to settle FTC allegations that ESBI . . . failed to adequately police the practice of vendors who engaged in cramming." *Id*. ¶ 22(b).  In *Saltzman v. Enhanced Services Billing, Inc.*, 811 N.E.2d 191 (Ill. App. Ct. 2003), the court reversed a trial court's dismissal of cramming claims against ESBI substantially identical to those asserted in this case.  The court said, "the complaint in this case alleged that it was ESBI's practice to receive billing information from [a third-party service provider], and without any evidence of authorization, place the 'bogus' charge on the victim's telephone bill, in effect, representing that the customer owed the charge." *Id*. at 197.  The court found these allegations distinguishable from the allegations at issue in *Zekman*.  "In our view, these allegations are different from the one made in . . . the . . . complaint in *Zekman*, which only alleged that AT & T knowingly received the benefits of Direct American's deceptive practices in violation of section 2 of the Fraud Act." *Id*.

The *Saltzman* court concluded, "we find that a question of fact exists as to whether the practice of billing phone customers, for charges that are not authorized and cannot be verified while representing that charges are owed, amounts to a direct participation in the fraud under section 2 of the Consumer Fraud Act."  811 N.E.2d at 199.  In so holding, the court gave weight to the consent order entered into by the FTC and ESBI, noting that section 2 of the ICFA mandates that, in construing the statute, courts must give consideration to the FTC's interpretation of what constitutes deceptive trade practices for purposes of the Federal Trade

6

Commission Act.  *See id*. at 199-200.  This Court agrees with *Saltzman* that the conduct at issue here is distinguishable from the conduct at issue in *Zekman*.  In contrast to *Zekman*, where the defendant telephone company merely billed the plaintiff for calls the plaintiff freely admitted he had made, here ESBI is alleged to have billed consumers, including Brown, for services they never ordered.  ESBI's role in the alleged fraud is hardly peripheral.  In fact it is quite central: ESBI is the means by which the unauthorized charges wind up on the customer's bill.  Therefore, the Court concludes that Brown has stated a claim for relief against ESBI.

Although SBC and Abry argue that Brown failed to use proper diligence in reviewing his telephone billing statement for unauthorized charges, it is well settled that under the ICFA "[a] plaintiff . . . does not have to show actual reliance or diligence in ascertaining the accuracy of [a defendant's] misstatements."  *Grove v. Huffman*, 634 N.E.2d 1184, 1188 (Ill. App. Ct. 1994). *See also Duran v. Leslie Oldsmobile, Inc.*, 594 N.E.2d 1355, 1361 (Ill. App. Ct. 1992) ("A plaintiff's diligence in ascertaining the accuracy of misstatements was . . . eliminated as an element of fraud by the [ICFA]."); *Munjal v. Baird & Warner, Inc.*, 485 N.E.2d 855, 864 (Ill. App. Ct. 1985) ("[U]nder the [ICFA], it is not necessary for a plaintiff to show actual reliance nor diligence in ascertaining the accuracy of the misstatements."); *Beard v. Gress*, 413 N.E.2d 448, 452 (Ill. App. Ct. 1980) ("[N]either the mental state of the person making a misrepresentation nor the diligence of the party injured to check as to the accuracy of the misrepresentation [is] material to the existence of a cause of action for that misrepresentation under [the ICFA]."); *Grimes v. Adlesperger*, 384 N.E.2d 537, 539 (Ill. App. Ct. 1978) ("[T]he [ICFA] . . . does not place a burden upon the plaintiff to check out the validity of the [misrepresentation].").  Moreover, it is apparent from the allegations of Brown's complaint that the nature of telephone cramming schemes is to insert small charges into consumers' telephone

7

bills in the expectation that they will not notice the charges or, if they do, that they will not understand that the charges are improper.  To hold that consumers are without a remedy precisely because a telephone cramming scheme worked as it was intended to do would be, in the Court's opinion, absurd.  It is the case, of course, that to establish proximate causation for purposes of the ICFA Brown must show that he was actually deceived by the misrepresentations at issue in this case.  *See Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 585 (N.D. Ill. 2005) (applying Illinois law) ("[T]o establish proximate causation and thus a violation of [the ICFA], a plaintiff actually must be deceived.").  At the pleading stage, however, all that is necessary to allege proximate causation is to assert, as Brown does, that after the alleged misrepresentations were made, the wrongful charges were paid.  *See Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 595 (Ill. 1996) (allegations that, after an auto manufacturer suppressed material facts about the safety of certain sport utility vehicles, consumers purchased the vehicles were sufficient to plead proximate causation under the ICFA:  "[T]he required allegation of proximate cause is minimal since that determination is best left to the trier of fact.").  *See also AGFA Corp. v. Wagner Printing Co.*, No. 02 C 2400, 2002 WL 1559663, at *4 (N.D. Ill. July 10, 2002).[2]

---

2.    Additionally, the Court rejects ESBI's contention that Brown has failed adequately to plead damages because he does not allege that he actually paid the charges at issue in this case.  In fact Brown's complaint alleges that "[d]uring the Class Period, Plaintiff and members of the Class paid their SBC telephone billing statement which included charges which they neither authorized nor used."  Compl. ¶ 31.  Moreover, Brown's complaint alleges that he first noticed unauthorized charges on his SBC billing statement early in 2005, and that the unauthorized charge for "Traveller Info Svcs #" appeared on his billing statements for February 2004, March 2004, May 2004, June 2004, and July 2004, while the unauthorized charge for "Nationwide Voice Msg" appeared on his billing statements for August 2004, September 2004, October 2004, November 2004, December 2004, and January 2005.  *See id.* ¶ 19, ¶ 20.  A reasonable inference to be drawn from these allegations is that, prior to his discovery of the charges in early 2005, Brown paid them; otherwise his telephone service likely would have been discontinued.

Finally, the Court disagrees with SBC, ESBI, BSG, and Abry that Brown's ICFA claim is not pleaded with adequate particularity under Rule 9 of the Federal Rules of Civil Procedure, which provides in pertinent part that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). *See also Eromon v. Grand Auto Sales, Inc.*, 351 F. Supp. 2d 825, 827 (N.D. Ill. 2004) (ICFA claims are subject to the pleading requirements of Rule 9(b)); *Jiang v. Allstate Ins. Co.*, 199 F.R.D. 267, 272 (N.D. Ill. 2001) (same). To satisfy the requirements of Rule 9(b), a plaintiff must "identi[f]y . . . the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated," *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (quoting *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992)). In other words, the plaintiff must plead "the who, what, when, where, and how:  the first paragraph of any newspaper story." *Crichton v. Golden Rule Ins. Co.*, Civil No. 06-264-GPM, 2006 WL 2349961, at *4 (S.D. Ill. Aug. 11, 2006) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). The purpose of Rule 9(b) is "to ensure that the party accused of fraud . . . is given adequate notice of the specific activity that the plaintiff claims constituted the fraud so that the accused party may file an effective responsive pleading," *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 783 (7th Cir. 1999), and to compel plaintiffs to undertake adequate pre-filing investigation of claims of fraud, so that defendants are not injured by groundless charges of deceit. *See Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999) ("The purpose . . . of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing his complaint. Greater precomplaint investigation is warranted in fraud cases because public charges of fraud can do great harm to

the reputation of a business firm or other enterprise (or individual).").

In this instance, as discussed, Brown has identified eleven specific occasions when his billing statement from SBC allegedly contained unauthorized charges for services he did not request.  Brown has alleged that the charges were placed on his billing statement by billing clearinghouses (ESBI and ILD), then collected by SBC.  Brown's complaint explains the role of each of the defendants in the alleged fraudulent scheme.  *See Heastie v. Community Bank of Greater Peoria*, 690 F. Supp. 716, 722 (N.D. Ill. 1988) (finding that an ICFA claim against two defendants arising from a fraudulent mortgage-lending scheme was pleaded with adequate particularity where "[t]he complaint alleges how FAMCO's and Alliance's scheme operated and, as between the two, who did what[.]").  It is apparent both that the complaint is the product of ample pre-filing investigation and that the defendants have adequate notice of the nature of Brown's claims to frame responsive pleadings.  It also is apparent that Brown has pleaded to the extent of his knowledge at this time.  Rule 9(b) is not to be applied in a manner that penalizes a plaintiff for lack of access to information through discovery.  "We don't want to create a Catch-22 situation in which a complaint is dismissed because of the plaintiff's inability to obtain essential information without pretrial discovery (normally of the defendant, because the essential information is in his possession and he will not reveal it voluntarily) that she could not conduct before filing the complaint . . . . Rule 9(b) is relaxed upon a showing of such inability."  *Emery v. American Gen. Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998).  Importantly, Rule 9(b) is not to be read in isolation but instead is intended to be applied in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure, which requires of course only a short and plain statement of a plaintiff's claim.  *See Tomera v. Galt*, 511 F.2d 504, 508 (7th Cir. 1975).  When Rule 9 is read in conjunction with Rule 8, a plaintiff is required to plead only "slightly more" than is demanded

under ordinary notice pleading. *Id*. at 508.  More specifically, a plaintiff must plead "the bare bones" of a fraudulent scheme, by supplying "a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants." *Id*. at 508, 509.  The reason, of course, is that under the liberal discovery provisions of the Federal Rules of Civil Procedure, "[m]ore information can be gathered through discovery." *Id*. at 509.  The allegations of Brown's complaint obviously comply with the standard set out in *Tomera* and thus, the Court finds that Brown's ICFA claim is pleaded with adequate particularity.

### 3.    Unjust Enrichment

As discussed, in addition to a claim under the ICFA, Brown's complaint also asserts a claim for unjust enrichment.  To state a claim for unjust enrichment under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *BancInsure v. BMB Elec. Co.*, No. 03 C 2692, 2004 WL 765124, at *3 (N.D. Ill. Apr. 8, 2004) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)).  *See also M & O Insulation Co. v. Harris Bank Naperville*, 783 N.E.2d 635, 639 (Ill. App. Ct. 2002) (to prevail on a claim of unjust enrichment "a plaintiff must present evidence that the defendant unjustly retained a benefit to the plaintiff's detriment and that the defendant's retention of that benefit violated fundamental principles of justice, equity, and good conscience.").  In this case, Brown alleges that he and the members of the proposed class have been charged for services they never ordered, and that the unauthorized charges they have paid constitute a benefit unjustly conferred on the defendants that must be disgorged:

> During the Class Period, Plaintiff and members of the Class paid their SBC telephone billing statement which included charges which they neither authorized nor used.

* * * *

Defendant SBC received the continued use and benefit of the improperly paid amounts by Plaintiff and members of the Class together with interest earned on the improperly billed and paid amounts.

* * * *

Defendants ESBI, ILD, Abry, [and] BSG . . . received payments resulting from the improperly paid amounts by Plaintiff and members of the Class.

* * * *

Defendant SBC is and has been in possession, custody, and/or control of the improperly billed and paid amounts during all relevant times.

* * * *

Defendants ESBI, ILD, Abry, [and] BSG . . . are and have been in possession, custody, and/or control of unlawfully obtained profits resulting from the improperly billed and paid amounts during all relevant times.

* * * *

The improperly paid amounts are property of Plaintiff and the members of the Class.

* * * *

As a consequence, Defendants SBC, ESBI, ILD, Abry, [and] BSG . . . have been and continue to be unjustly enriched by virtue of [their] continued possession of the improperly billed and paid amounts.  Accordingly, Defendants must return the improperly billed and unpaid [sic] amounts to Plaintiff and members of the Class.

Compl. ¶¶ 30-37.

Although the allegations of Brown's complaint clearly state a claim for unjust enrichment, the defendants nonetheless raise a number of objections.  For example, both SBC and Abry seem to suggest that, because Brown in fact received a valuable service in return for the charges at issue, there has been no unjust enrichment.  Assuming for the sake of argument that any services were in fact made available to Brown in return for the charges at issue, the

12

complaint specifically alleges that Brown never used the services for which he was charged, *see* Compl. ¶ 30, and in fact the entire point of Brown's allegations is that neither he nor any of the members of the proposed class requested such services or were aware that they were being charged for them.  It is impossible to fathom how providing Brown with a service he did not request, did not use, and was not aware he was paying for could foreclose Brown's right to seek restitution.  If the gist of the argument is that SBC or Abry have suffered a detriment as a result of allegedly furnishing services to Brown and the members of the proposed class, *see* Restatement (First) of Restitution § 69 (1937), that obviously is not a question the Court can address in resolving a Rule 12(b)(6) motion, which, as discussed, simply tests the legal sufficiency of the allegations of a plaintiff's complaint.

To the extent the defendants argue that their conduct was merely negligent or does not otherwise rise to the level of inequity required to maintain a claim for unjust enrichment, the Court does not agree.  The Court does not interpret Illinois law as requiring wrongful conduct as a necessary element of an unjust enrichment claim.  *See Midcoast Aviation, Inc. v. General Elec. Credit Corp.*, 907 F.2d 732, 738 n.3 (7th Cir. 1990) (quoting *Partipilo v. Hallman*, 510 N.E.2d 8, 11 (Ill. App. Ct. 1987)) ("[A] cause of action based on unjust enrichment . . . does not require fault on the part of the defendant."); *Board of Highway Comm'rs, Bloomington Township v. City of Bloomington*, 97 N.E. 280, 285 (Ill. 1911) (imposing quasi-contract liability despite an absence of "wrongful intention on the part of anyone in connection with this transaction."). "The cause of action based on unjust enrichment . . . does not require fault or illegality on the part of the defendant; rather, the essence of the cause of action is that one party is enriched and it would be unjust for that party to retain the enrichment."  *Firemen's Annuity & Benefit Fund v. Municipal Employees', Officers', & Officials' Annuity & Benefit Fund of Chicago*, 579 N.E.2d

13

1003, 1007 (Ill. App. Ct. 1991).  In any event, as discussed, Brown clearly alleges fraud on the part of the defendants.

Finally, while SBC contends that it has received no benefit as a result of the practices complained of in this case, the Court finds it unlikely that SBC received no compensation for collecting the allegedly unauthorized charges and, most importantly, the allegations of Brown's complaint, with which the Court is solely concerned at this juncture, plainly assert that SBC has received an unjust benefit as a result of collecting the charges.  As to the argument SBC raises by way of a reply brief that, because its relationship with Brown is governed by an express contract, it cannot be liable to Brown in quasi-contract, while the Court will give this issue careful attention at the summary judgment stage, at the pleading stage Brown is entitled to assert a claim in quasi-contract, regardless of the existence of an express contract.  *See* Fed. R. Civ. P. 8(e)(2) (authorizing a party to "set forth two or more statements of a claim or defense alternately or hypothetically" and to "state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds."); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1116-17 (S.D. Ind. 2001) (permitting plaintiffs to assert at the pleading stage alternative theories of relief based on contract and quasi-contract); *Quadion Corp. v. Mache*, 738 F. Supp. 270, 278 (N.D. Ill. 1990) (same); *McIntosh v. Magna Sys., Inc.*, 539 F. Supp. 1185, 1190-91 (N.D. Ill. 1982) (same).  *Cf. Donaldson v. Pharmacia Pension Plan*, 435 F. Supp. 2d 853, 869 n.5 (S.D. Ill. 2006) (quoting *Weft, Inc. v. G.C. Inv. Assocs.*, 630 F. Supp. 1138, 1144 (E.D.N.C. 1986)) (under Rule 8(e)(2), "[a]lthough plaintiffs may not obtain a duplicative recovery, there is no requirement that they elect one remedy over another prior to final judgment.").  The Court concludes that Brown has stated a claim for unjust enrichment.

### 4.    Voluntary Payment Doctrine

SBC and Abry contend that Brown's claims are barred by the voluntary payment doctrine.  Generally speaking, the voluntary payment doctrine is "a corollary to the mistake of law doctrine" and holds that "a person who voluntarily pays another with full knowledge of the facts will not be entitled to restitution."  *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 667 (7th Cir. 2001)).  *See also Edward P. Allison Co. v. Village of Dolton*, 181 N.E.2d 151, 153 (Ill. 1962); *Illinois Glass Co. v. Chicago Tel. Co.*, 85 N.E. 200, 201 (Ill. 1908); *Smith v. Prime Cable of Chicago*, 658 N.E.2d 1325, 1329-30 (Ill. App. Ct. 1995).  The Court finds that dismissal is not warranted on this ground.

As Brown points out, the voluntary payment doctrine applies solely to payments made under a mistake of law.  In this case, of course, Brown alleges that the payments at issue were not voluntary at all and instead were procured through fraud, which is a well-recognized exception to the voluntary payment doctrine.  *See, e.g., Flournoy v. Ameritech*, 814 N.E.2d 585, 588-89 (Ill. App. Ct. 2004) (holding that the voluntary payment doctrine did not bar a former prison inmate's suit against a telephone company that provided telephone service to the prison where the inmate was held to recover toll charges incurred as a result of the company's alleged policy of intentionally terminating collect calls from the prison for the purpose of collecting multiple fees and surcharges, where the payments allegedly were procured through fraud).  The voluntary payment doctrine likewise does not bar claims to recover payments made under a mistake of fact, and thus would not bar the claims of Brown and the proposed class if they made the payments at issue under a mistake of fact as to whether they had in fact ordered the services for which they allegedly were billed.  *See Randazzo*, 262 F.3d at 668 (noting that

15

"Illinois recognizes the traditional defenses to the voluntary payment doctrine," including "fraud and mistake of fact"). Finally, the Illinois Supreme Court has held that payments coerced through explicit or implicit threats to terminate telephone service are not voluntary and instead are the product of duress such as to take them out of the scope of the voluntary payment doctrine. *See Getto v. City of Chicago*, 426 N.E.2d 844, 850-51 (Ill. 1981).

In the Court's view, the applicability of the various exceptions to the voluntary payment doctrine is not an issue susceptible of resolution on the pleadings. *See Crain v. Lucent Techs., Inc.*, 739 N.E.2d 639, 644 (Ill. App. Ct. 2000) (noting that under Illinois law the question of the applicability of the voluntary payment doctrine and exceptions thereto is essentially factual and that "[t]he resolution of this issue will require the presentation of evidence so that the court or fact finder can determine whether a payment was voluntarily made without protest and without fraud or mistake."). At this juncture it is sufficient that, under some set of facts consistent with the allegations of Brown's complaint, he could be entitled to relief on his claims. Therefore, the Court declines to dismiss Brown's claims on the basis of the voluntary payment doctrine.[3]

---

3.    The Court also expresses some skepticism about the applicability of the voluntary payment doctrine to Brown's claim under the ICFA. The ICFA is of course remedial legislation that is construed broadly to effect its purpose, namely, to eradicate all forms of deceptive and unfair business practices and to grant appropriate remedies to defrauded consumers. *See Peter J. Hartmann Co. v. Capital Bank & Trust Co.*, 694 N.E.2d 1108, 1116 (Ill. App. Ct. 1998). The ICFA "creat[es] a new cause of action that affords consumers broad protection by prohibiting any 'deception' or 'false promise.'" *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 11 (Ill. App. Ct. 2001) (quoting *Smith*, 658 N.E.2d at 1335). Although the Court need not decide the issue, the Court notes authority for the view that remedial legislation like the ICFA is not subject to common-law defenses. *See Simmons v. Union Elec. Co.*, 473 N.E.2d 946, 954 (Ill. 1984) (comparative negligence was not a defense in actions under the now-repealed Structural Work Act, a remedial statute intended to protect persons engaged in extra-hazardous occupations like the construction, repair, alteration, or removal of buildings, bridges, viaducts, and other structures); *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 356 (Ill. 1978) (the Illinois Workers' Compensation Act is remedial legislation intended to compensate injured workers by depriving employers of common-law defenses like contributory negligence); *Nelson v. Araiza*, 372 N.E.2d

5.      **Corporate Veil**

Finally, both BSG and Abry assert the corporate form as grounds for dismissal of

Brown's claims against those defendants.  Specifically, BSG contends that it cannot be held

liable in this case merely because ESBI is its wholly-owned subsidiary, and Abry contends that it

cannot be held liable merely by virtue of having been a past or present shareholder in BSG.

Both defendants are correct.  "Under Illinois law, a corporation is a legal entity separate and

distinct from its shareholders, directors and officers, and, generally, from other corporations with

which it may be affiliated."  *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569

(7th Cir. 1985) (citing *Main Bank of Chicago v. Baker*, 427 N.E.2d 94 (Ill. 1981)).  *See also*

*Polites v. U.S. Bank Nat'l Ass'n*, 836 N.E.2d 133, 137 (Ill. App. Ct. 2005) ("In Illinois,

corporations are treated as separate legal entities even where one wholly owns the other and the

two have mutual dealings."); 1 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of*

*Private Corporations* § 25 (perm. ed., rev. vol. 1999) ("It is generally accepted that the

corporation is an entity distinct from its shareholders . . . with rights and liabilities not the same

as theirs individually and severally.") (collecting cases).  In rare instances courts will disregard

the corporate form to impose liability on shareholders and affiliated corporations if there is "such

unity of interest and ownership that the separate personalities of the corporation and the

individual [or other corporation] no longer exist" and "circumstances [are] such that adherence

---

637, 639 (Ill. 1978) (the affirmative defense of contributory negligence is not available in a suit
under the Illinois Dram Shop Act, which is a statutory right of action not based on negligence).
*See also Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 461-62 (Tex. App. 1990) (common-law
defenses are not available in an action under the state Deceptive Trade Practices Act ("DTPA"):
"The DTPA does not represent a codification of the common law.  A primary purpose of the
enactment of the DTPA was to provide consumers a cause of action for deceptive trade practices
without the burden of proof and numerous defenses encountered in a common law fraud or
breach of warranty suit.").

to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Van Dorn Co.*, 753 F.2d at 569-70. *See also Main Bank of Chicago*, 427 N.E.2d at 101 (under Illinois law courts will disregard the corporate form where it is shown that a corporation "is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice."). However, piercing the corporate veil is an equitable remedy that Illinois courts should "undertake[ ] reluctantly." *Walker v. Dominick's Finer Foods, Inc.*, 415 N.E.2d 1213, 1217 (Ill. App. Ct. 1980).

While the Court recognizes the primacy of the doctrine of separate corporate identity, the Court is not aware of any requirement that a plaintiff plead facts to establish grounds for piercing the corporate veil. *See Ishkhanian v. Forrester Clinic S.C.*, No. 02 C 9339, 2003 WL 21479072, at *3 (N.D. Ill. June 25, 2003) ("[I]n order for the claim to withstand a motion to dismiss for failure to state a claim in federal court, no . . . substantial showing . . . of fact [regarding the propriety of piercing the corporate veil] is demanded."); *Steel Warehouse of Wis., Inc. v. Caterpillar, Inc.*, No. 90 C 20053, 1990 WL 304266, at *2 (N.D. Ill. Nov. 13, 1990) (a complaint was not subject to dismissal for failure to state a claim upon which relief can be granted merely because it did not plead the elements that must be proved to pierce the corporate veil under Illinois law). Although the Court will give close scrutiny to Brown's claims against BSG and Abry at the summary judgment stage, the Court concludes that those claims are not subject to dismissal at the pleading stage.

### C.     Lack of Personal Jurisdiction

As discussed, ILD has moved for dismissal from this action on grounds of lack of personal jurisdiction. On a motion to dismiss for lack of personal jurisdiction brought pursuant

to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a plaintiff bears the burden of proving that personal jurisdiction exists.  *See Central States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 939 (7th Cir. 2000).  When a motion to dismiss is to be decided solely on written materials, the plaintiff need only make a prima facie case for personal jurisdiction.  *See Neiman v. Rudolf Wolff & Co.*, 619 F.2d 1189, 1190 (7th Cir. 1980).  In deciding the motion to dismiss, the court may receive and consider affidavits from both parties.  *See Greenberg v. Miami Children's Hosp. Research Inst., Inc.*, 208 F. Supp. 2d 918, 922 (N.D. Ill. 2002) (citing *Kontos v. United States Dep't of Labor*, 826 F.2d 573, 576 (7th Cir. 1987)).  "[A]ll well-pleaded jurisdictional allegations in the complaint are accepted as true unless controverted by affidavit."  *Travelers Cas. & Sur. Co. v. Interclaim (Bermuda) Ltd.*, 304 F. Supp. 2d 1018, 1021 (N.D. Ill. 2004).  *See also Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987).  Any conflicts in the pleadings and affidavits are to be resolved in a plaintiff's favor, but a court accepts as true any facts contained in a defendant's affidavits that remain unrefuted by the plaintiff.  *See Continental Cas. Co. v. Marsh*, No. 01 C 0160, 2002 WL 31870531, at *2 (N.D. Ill. Dec. 23, 2002) (citing *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997)).

In a case based upon diversity of citizenship, a federal district court sitting in Illinois has personal jurisdiction over a nonresident defendant only if an Illinois court would have jurisdiction.  *See Netzky v. Fiedler*, No. 00 C 4652, 2001 WL 521396, at *1 (N.D. Ill. May 15, 2001).  For an Illinois court to have personal jurisdiction over a nonresident defendant, personal jurisdiction must be permitted by:  (1) Illinois statutory law; (2) the Illinois Constitution; and (3) the Constitution of the United States.  *See Continental Cas. Co.*, 2002 WL 31870531, at *4.  With respect to Illinois statutory law, the Illinois long-arm statute, 735 ILCS 5/2-209, extends

19

personal jurisdiction to the limit allowed under the Illinois Constitution and the United States Constitution.  *See LaSalle Bank Nat'l Ass'n v. Epstein*, No. 99 C 7820, 2000 WL 283072, at *1 (N.D. Ill. Mar. 9, 2000) (citing *RAR, Inc.*, 107 F.3d at 1276).  "Because the Illinois statute authorizes personal jurisdiction to the [federal] constitutional limits, the three inquiries . . . collapse into two constitutional inquiries – one state and one federal."  *Continental Cas. Co.*, 2002 WL 31870531, at *4 (quoting *RAR, Inc.*, 107 F.3d at 1276).  If jurisdiction is improper under either the Illinois Constitution or the United States Constitution, a court cannot exercise jurisdiction over a defendant.  *See id.*

The Illinois Supreme Court has held that, under the Illinois Constitution's guarantee of due process, jurisdiction is to be "asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois."  *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002) (quoting *Rollins v. Ellwood*, 565 N.E.2d 1302, 1316 (Ill. 1990)).  The United States Court of Appeals for the Seventh Circuit has recognized that the Illinois courts "have given little guidance as to how state due process protection differs from federal protection in the context of personal jurisdiction."  *RAR, Inc.*, 107 F.3d 1276.  Furthermore, the Seventh Circuit Court of Appeals has held that "there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction."  *Hyatt Int'l Corp.*, 302 F.3d at 715.

Correspondingly, district courts in this Circuit typically analyze personal jurisdiction solely with reference to federal due process standards, not Illinois due process standards.  *See Continental Cas. Co.*, 2002 WL 31870531, at *4 (conducting only a federal due process analysis because the parties did not present any evidence to suggest that the outcome would be otherwise

20

under state law); *United Fin. Mortgage Corp. v. Bayshores Funding Corp.*, 245 F. Supp. 2d 884, 891-92 (N.D. Ill. 2002) (condensing the personal jurisdiction analysis to a single federal due process inquiry). In this case, the parties make no arguments regarding whether personal jurisdiction would be fair, just, and reasonable under the Illinois Constitution. Rather, they dispute whether personal jurisdiction would comport with federal due process requirements. Thus, the Court will proceed to the federal due process inquiry. *See MAC Funding Corp. v. Northeast Impressions, Inc.*, 215 F. Supp. 2d 978, 980 (N.D. Ill. 2002) (proceeding directly to the federal personal jurisdiction analysis where the parties failed to address Illinois standards and the court's own research revealed nothing that would indicate that Illinois law would lead to a different outcome than federal law).

Under the United States Constitution, the Due Process Clause of the Fourteenth Amendment limits a court's power to assert personal jurisdiction over a nonresident defendant. *See RAR, Inc.*, 107 F.3d at 1277 (citing *Pennoyer v. Neff*, 95 U.S. 714, 733 (1878)). Federal due process requires that a nonresident defendant have certain minimum contacts with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Hyatt Int'l Corp.*, 302 F.3d at 716 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). This standard varies depending on whether the jurisdiction alleged is general or specific. *See RAR, Inc.*, 107 F.3d at 1277. "[G]eneral jurisdiction allows a defendant to be sued in the forum regardless of the subject matter of the litigation." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 787 (7th Cir. 2003). It is permitted "only where the defendant has 'continuous and systematic general business contacts' with the forum." *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). "Those contacts must be so extensive as to make it

21

'fundamentally fair to require [defendants] to answer in any [Illinois] court in any litigation arising out of any transaction or occurrence taking place anywhere in the world.'" *Travelers Cas. & Sur. Co.*, 304 F. Supp. 2d at 1024 (quoting *Purdue Research Found.*, 338 F.3d at 787) (emphases omitted).  Several factors are considered in making this analysis:  (1) whether and to what extent a defendant conducts business in the forum state; (2) whether the defendant maintains an office or employees within the forum state; (3) whether the defendant sends agents into the forum state to conduct business; (4) whether the defendant advertises or solicits business in the forum state; and (5) whether the defendant has designated an agent for service of process in the forum state.  *See Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.*, 262 F. Supp. 2d 898, 906-07 (N.D. Ill. 2003).  General jurisdiction is a demanding standard that is "considerably more stringent . . . than that required for specific jurisdiction." *Purdue Research Found.*, 338 F.3d at 787.  *See also Griffith v. Wood Bros.*, No. 04 C 3118, 2004 WL 2418296, at *8 (N.D. Ill. Oct. 27, 2004).

In this instance the parties do not dispute that general jurisdiction over ILD is lacking. The uncontroverted affidavit of Kathy McQuade, the vice president of ILD's billing and collection division, establishes that ILD is a Florida-based corporation that has no office or employees in Illinois, sends no employees into Illinois to conduct business, and has no continuous and systematic general business contacts with Illinois.  *See* Doc. 14, Ex. A ¶¶ 2-4. The charge for "Nationwide Voice Msg" Brown alleges ILD placed on his billing statement arises from a contract for billing services entered by ILD with a non-Illinois company called National Voice Messaging, Inc.  *See id.* ¶ 11.  Brown does not argue that the Court has general jurisdiction over ILD and instead argues that the Court has specific jurisdiction over ILD.  The Court agrees.

22

By contrast with general jurisdiction, in specific jurisdiction cases a suit must "arise out of" or be "related to" the defendant's minimum contacts with the forum state. *Hyatt Int'l Corp.*, 302 F.3d at 716. In determining whether specific personal jurisdiction exists, a court must first address whether a defendant has "purposefully established minimum contacts within the forum State." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). It is critical that the court determine whether the defendant "should reasonably anticipate being haled into court [in the forum State]." *Id.* (quoting *Burger King Corp.*, 471 U.S. at 474). The defendant may reasonably anticipate being haled into court in the forum state when it has "'purposefully avail[ed] itself of the privilege of conducting activities' there." *Id.* (quoting *Burger King Corp.*, 471 U.S. at 475). If the court determines that minimum contacts with the forum exist, the court must then determine whether those contacts would make personal jurisdiction "reasonable and fair under the circumstances." *RAR, Inc.*, 107 F.3d at 1277. After minimum contacts have been established, a defendant "can only escape jurisdiction by making a 'compelling case' that forcing it to litigate in [the forum] would violate traditional notions of fair play and substantial justice." *Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir. 1996) (quoting *Burger King Corp.*, 471 U.S. at 477). In assessing whether jurisdiction is consistent with fair play and substantial justice a court should consider: (1) the burden on a defendant in litigating in the forum; (2) the interests of the forum state; (3) a plaintiff's interest in obtaining convenient and effective relief; (4) the interests of the interstate judicial system in obtaining an efficient resolution of the controversy; and (5) the interests of the several states in furthering fundamental substantive policies. *See id. See also Eragen Biosciences, Inc. v. Nucleic Acids Licensing, LLC*, 447 F. Supp. 2d 930, 939 (W.D. Wis. 2006); *Andersen v. Sportmart, Inc.*, 57 F. Supp. 2d 651, 661 (N.D. Ind. 1999).

Under the "effects doctrine," specific personal jurisdiction over a nonresident defendant is proper when the defendant's intentional tortious actions aimed at the forum state cause harm to a plaintiff in the forum state, and the defendant knows such harm is likely to be suffered.  In *Calder v. Jones*, 465 U.S. 783 (1984), the Court held that it was proper for a California court to exercise personal jurisdiction over two Florida tabloid journalists who wrote an allegedly libelous article about a California-based entertainer.  The defendants argued that they should not be subjected to jurisdiction merely because the impact of their conduct was felt in California.  The Court disagreed:

> . . . [P]etitioners are not charged with mere untargeted negligence.  Rather, their intentional, and allegedly tortious, actions were expressly aimed at California.  [Petitioners] . . . wrote and . . . edited an article that they knew would have a potentially devastating impact upon respondent.  And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the [Petitioners' employer] has its largest circulation.  Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article.

*Id*. at 789-90 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  The Court concluded, "Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California."  *Id*. at 789.  This Circuit interprets the effects doctrine broadly.  For example, in *Janmark, Inc. v. Reidy*, 132 F.3d 1200 (7th Cir. 1997), the plaintiff, a seller of mini shopping carts, brought an action against a California competitor, seeking a declaratory judgment and asserting a claim of tortious interference with prospective economic advantage.  *See id*. at 1201-02.  Finding that a single phone call from the California defendant to a customer of the plaintiff in New Jersey could not be a tort within Illinois, the district court dismissed the foreign defendant for lack of personal jurisdiction.  *See id*.  Reversing, the Seventh Circuit reasoned that because without an injury there is no tort and that a

24

wrong does not become a tort until an injury has occurred, the location of the injury is vital to understanding where the tort occurred.  *See id*. at 1202.  Because the injury took place in Illinois, the *Janmark* court held, the tort occurred in Illinois and thus was actionable in Illinois.  *See id*. The court held that "the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor" even if all the other relevant conduct took place outside of the forum state.  *Id*. (citing *Calder*).  "[T]he state in which the injury (and therefore the tort) occurs may require the wrongdoer to answer for its deeds even if events were put in train outside its borders."  *Id*.  *See also Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 411-12 (7th Cir. 1994) (a Maryland defendant could be sued in Indiana for the tort of trademark infringement based on the name of a football team, because the injury of the impaired trademark would "be felt mainly in Indiana," and "someone who commits a tort in Indiana should . . . be amenable to suit there."); *Riddell, Inc. v. Monica*, No. 03 C 3309, 2003 WL 21799935, at *3 (N.D. Ill. July 25, 2003) ("As defendants [who allegedly misappropriated the plaintiff's trade secrets] were aware, plaintiff's principal place of business is in Illinois, and thus the injury would be felt most severely in Illinois.  Under the circumstances, it was foreseeable that defendants would be required to answer for such actions in Illinois."); *International Molding Mach. Co. v. St. Louis Conveyor Co.*, No. 01 C 8305, 2002 WL 1838130, at *4 (N.D. Ill. Aug. 12, 2002) ("[S]pecific jurisdiction can be proper when the injury occurs in Illinois, even if all of the other relevant conduct took place elsewhere."); *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F. Supp. 2d 914, 920 (C.D. Ill. 2000) (relying on *Janmark* to hold that a New York corporation which committed the "torts" of trademark infringement and unfair competition against an Illinois corporation, so that the injury was felt in Illinois, submitted itself to the jurisdiction of the Illinois courts).

In this case, the gravamen of Brown's claims is, of course, that ILD placed false charges for "Nationwide Voice Msg" on his billing statement.  ILD certainly knew that it was processing billing data for Illinois telephone subscribers and therefore was on notice that such false charges could result in the company being haled into court in Illinois.  "A single telephone call into Illinois can give rise to Illinois jurisdiction as long as the call constitutes the commission of a tortious act within Illinois." *Pendelton v. Germino*, No. 95 C 2350, 1995 WL 493449, at *8 (N.D. Ill. Aug.15, 1995) (holding that a nonresident defendant's alleged "repeated phone calls" to a plaintiff in Illinois did not give rise to personal jurisdiction over the defendant, because the calls themselves did not constitute tortious acts in Illinois).  *See also Heritage House Rests., Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276, 282 (7th Cir. 1990) (a nonresident defendant's alleged misrepresentation during a telephone conversation that the entire amount of an Illinois corporation's $150,000 deposit with a savings and loan would be secured for repayment brought the defendant within the Illinois long-arm statute as to a misrepresentation cause of action and an alleged violation of the ICFA where the phone conversation was the basis for the alleged tort); *Evercom Sys., Inc. v. Mannis*, No. Civ.A.3:03-CV-2956-M, 2004 WL 396885, at *2 (N.D. Tex. Feb. 20, 2004) (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir.1999)) (when the actual content of a defendant's communications with a forum state gives rise to intentional tort causes of action due to fraud, the communication constitutes purposeful availment for purposes of personal jurisdiction because the defendant is purposefully availing itself of the "privilege of causing a consequence" in the forum state); 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1069.5 (3d ed. 1998 & Supp. 2006) ("Even an act done by an individual outside the state that has consequences within the state should suffice as a basis for asserting personal jurisdiction in a suit arising from those

consequences if the effect reasonably could have been expected to follow from the defendant's conduct[.]") (collecting cases).

Having concluded that ILD has minimum contacts with Illinois, the Court turns to the question of whether it offends traditional notions of fair play and substantial justice to require ILD to defend this action in Illinois.  The Court finds that it does not.  In evaluating substantial justice and fair play, "the most important factors to consider are the interests of the forum and the relative convenience of litigating in that forum."  *International Molding Mach. Co.*, 2002 WL 1838130, at *5 (citing *Kohler Co. v. Kohler Int'l, Ltd.*, 196 F. Supp. 2d 690, 700 (N.D. Ill. 2002)).  The Court concludes that litigating this case in Illinois will place a minimal burden upon ILD.  ILD is a corporate defendant that processes billing data for telephone subscribers nationwide, including Illinois.  *See Logan Prods., Inc.*, 103 F.3d at 54 (noting that it is usually not unfair to force a defendant to defend a lawsuit in a state in which it has engaged in economic activity); *Birnberg v. Milk St. Residential Assocs. Ltd. P'ship*, Nos. 02 C 0978, 02 C 3436, 2003 WL 151929, at *8 (N.D. Ill. Jan. 21, 2003) (holding that travel from Massachusetts to Illinois was not oppressive due to modern advances in communication and transportation).  No doubt it would be vastly more onerous for Brown, who is alleged to be a disabled retiree, to litigate his claims against ILD in Florida, and, in any event, unless the inconvenience of having to litigate in the forum is so great as to deprive a defendant of due process, it will not overcome clear justifications for the exercise of personal jurisdiction.  *See Euromarket Designs, Inc. v. Crate & Barrel, Ltd.*, 96 F. Supp. 2d 824, 840 (N.D. Ill. 2000).  Illinois has a significant interest in the adjudication of this case, given that ILD's allegedly tortious conduct has caused injury to Brown and numerous other Illinois citizens in Illinois.  *See International Molding Mach. Co.*, 2002 WL 1838130, at *5 (holding that Illinois has a strong interest in adjudicating cases arising

from injuries occurring in its borders).  This case clearly does not present the "rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum."  *CoolSavings.Com, Inc. v. IQ.Commerce Corp.*, 53 F. Supp. 2d 1000, 1005 (N.D. Ill. 1999) (quoting *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1568 (Fed. Cir. 1994)).  In sum, the Court finds that the exercise of personal jurisdiction over ILD in this case does not offend traditional notions of fair play and substantial justice.  The Court concludes that it has personal jurisdiction over ILD.

      **D.**    **Conclusion**

      The motions to dismiss for failure to state a claim upon which relief can be granted brought by SBC (Doc. 17), ESBI and BSG (Doc. 12), and Abry (Doc. 15) are **DENIED**.  The motion to dismiss for lack of personal jurisdiction brought by ILD (Doc. 13) is **DENIED**.

**IT IS SO ORDERED.**
**DATED: March 1, 2007**

                                     **s/ J. Phil Gilbert**
                                     **J. PHIL GILBERT**
                                     **DISTRICT JUDGE**